FILED
APR 21 2021
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA AND INDIANA, CALIFORNIA, FLORIDA, GEORGIA, ILLINOIS, KENTUCKY, LOUISIANA, MICHIGAN, RHODE ISLAND, TENNESSEE, WASHINGTON AND IN EVERY JURISDICTION THAT PROCURES WITH THE DEFENDANT EX REL. [UNDER SEAL],<br><br>PLAINTIFF(S),<br><br>vs.<br><br>[UNDER SEAL],<br><br>DEFENDANT(S) | 1 : 21 -cv- 0986 JMS -TAB<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL<br><br>FILED UNDER SEAL PURSUANT TO IC 5-11-5.5, IC 5-11-5.7, AND 31 U.S.C. § 3730(b)(2) |

Keith Mosley II
GA Bar # 203514
2161 Peachtree Rd #403
Atlanta, Ga 30309
Tel: (404) 725-6181
Email: keith.mosley@mosley-law.com

Attorney for Plaintiff-Relator
Lucretia Brinson

FILED
APR 21 2021
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA AND INDIANA, CALIFORNIA, FLORIDA, GEORGIA, ILLINOIS, KENTUCKY, LOUISIANA, MICHIGAN, RHODE ISLAND, TENNESSEE, WASHINGTON AND IN EVERY JURISDICTION THAT PROCURES WITH THE DEFENDANT EX REL. LUCRETIA BRINSON,<br><br>PLAINTIFF(S),<br><br>vs.<br><br>DELOITTE, ET AL.<br><br>DEFENDANT(S) | 1:21-cv-0986 JMS -TAB<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL<br><br>FILED UNDER SEAL PURSUANT TO IC 5-11-5.5, IC 5-11-5.7, AND 31 U.S.C. § 3730(b)(2) |

Plaintiff Lucretia Brinson, through her attorney, Keith Mosley II, on behalf of the United State of America and Indiana, California, Florida, Georgia, Illinois, Louisiana, Michigan, Rhode Island, Tennessee, Washington, and in every jurisdiction that procures with the Defendant (collectively "the government) alleges as follows:

## I. NATURE OF ACTION

1. This civil action alleges that, since at least 2016, Defendant has breached contractual and statutory provisions and knowingly submitted, and continues to submit, false and fraudulent claims to state and federal human services programs as part of delivering products and services to modernize their eligibility systems and to leverage data and analytics to streamline and improve performance of eligibility determination and service delivery to their constituencies.

2. Defendant has done so despite knowing that such violations are not in compliance with specifications and requirements defined in state and federal statutes, and subsequent state and federal contractual provisions.

3. Since at least 2016, Defendant has knowingly submitted false claims to the U.S. Department of Health and Human Services, U.S. Centers for Medicare and Medicaid (CMS), U.S. Department of Agriculture, U.S. Food and Nutrition Service (FNA), U.S. Department of Labor, and other government programs (hereafter collectively "government programs") and received payments and benefits to which they are not entitled. Defendant's knowing submission of false and fraudulent invoices and billings for payment constitutes a violation of the federal False Claims Act, 31 U.S.C. § § 3729 et seq. ("FCA" or "Act"); the Indiana False Claims and Whistleblower Protection Act (IC §§ 5-11-5.5, et seq); the Medicaid False Claims and Whistleblower Protection (IC 5.11.5.7 et seq); California (AB 2570; CFCA §§ 12650, et seq); Florida (FS 68.081, et seq); Georgia (GS §§ 49-4-168. et seq); Illinois (740 ILCS §§ 175/1, et seq); Louisiana (LS § § 46:437.1, et seq); Michigan (MS §§ 400.601, et seq); Oregon (ORS 180.760, et seq and ORS 180.785, et seq); Rhode Island (RI Chapter 1.1 §§ 9-1.1-1, et seq); Tennessee (TS §§ 71-5-181, et seq); Washington (WS RCW 74.09 §§ 101, et seq); and in every other jurisdiction with false claims statutes that procures with the Defendant (collectively "state FCAs").

4. As a result of their fraudulent conduct, Defendant has caused the government to sustain a direct loss of taxpayer money and damage to constituency confidence in the government's ability to protect their interests and to deliver quality, timely, and accurate services to them.

5. The FCA made liable a person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government, including federal, state and local government affiliates, a false or fraudulent claim for payment or approval or knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

6. A claim is "false" if the party is not entitled to the payment for work or services that were not performed or delivered, or a claim for work or services delivered contrary to the requirements or specifications.

7. The FCA prohibits knowingly presenting, or causing to be presented, to the government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

8. The FCA also prohibits knowingly making or using, or causing to be made or used, a false or fraudulent record or statement (i) material to a false or fraudulent claim or (ii) to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government. 31 U.S.C. §§ 3729(a)(1)(G).

9. Any person who violated the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the loss sustained by the United States, including adjustments by the Civil Penalties Inflation Act. 31 U.S.C. §3729(a); 64 Fed. Reg. 47099, 47103 (1999).

10. There are comparable provisions contained in the state FCAs previously described herein. The FCA defines "knowingly" as having knowledge that the information is false, or acting with a deliberate ignorance of, or reckless disregard of, the truth or falsity of the information. 31 U.S.C. § 3729(b)(1).

11. The FCA and state FCAs allow any person having information about violations to bring a civil action on behalf of the government and to share in any recovery.

12. The FCA and state FCAs require that the complaint be filed under seal for a minimum of 60 days, without service on the Defendant during that time, to allow the government time to conduct its own investigation and to determine whether to join the civil action.

13. In accordance with the provisions of the federal FCA and state FCAs, Relator seeks to recover all available damages, civil penalties, and other relief for the federal and state violations alleged herein, in every jurisdiction that the Defendant's misconduct has extended.

## II. PARTIES

14. The Defendant is a UK incorporated international professional services firm with US headquarters in New York City, New York with over 100 locations worldwide. Defendant is widely regarded as the top revenue generating firm within the Big Four providing audit, tax, risk, financial advisory, and consulting services. Defendant is one of the largest privately-owned organization in the United States serving as a government contractor.

15. The Relator is a United States citizen who worked for the Defendant on a long-term travel project performing contractual services for the State of Indiana and United States Government from 2016 to 2020. She was hired by the Defendant in 2013 with over 15 years of direct comparable senior level experience. The Relator also possessed several industry distinctions, including an SPHR and CCP from the Society of Human Resources Management (SHRM). The Relator was extremely proud to work for the Defendant.

16. Prior to joining the State of Indiana project, the Relator worked in several other states performing similar services for the Defendant. One of those projects, Access Health CT, was featured as a success story by the Kaiser Family Foundation, a health policy group. The Chief Operating Officer (CEO), Access Health CT, overseeing the State of Connecticut's successful implementation, later became the CEO of HealthCare.gov for the Obama Administration.

17. The Relator was selected by the Defendant and the State of Indiana based on her prior exceptional performance in leading teams and managing client relationships on complex engagements and thus was contractually designated as a "key person". Only a small number of individuals are contractually designated as a "key person".

18. A "key person" is "essential to the services offered" and cannot "be removed" by the Defendant "from the performance of the services" or "reassigned to another project" or subject to "substitution of another for the key person", without "written approval" of the State of Indiana.

19. The Relator was selected and designated as a "key person" with the goal and objective of turning around and remediating numerous issues experienced by the State of Indiana. These issues included quality and timeliness in the delivery of services for core phases of the industry standard Software Development Life Cycle (SDLC) and the Defendant's proprietary Enterprise Value Delivery (EVD) methodology.

20. The Relator successfully led a team of over 160 employees and subcontractors to remediate assigned issues resulting in the on-time, on-budget delivery of assigned services required to meet the go-live criteria and other contractual requirements and specifications publicly depicted in the State of Indiana previous and current contracts (https://www.in.gov/doa/procurement/) with the Defendant, the Patient Protection and Affordable Care Act (https://aspe.hhs.gov/report/opportunities-under-affordable-care-act-human-services-programs-modernize-eligibility-systems-and-expedite-eligibility-determination/generous-federal-funding-modernize-eligibility-systems and https://www.healthcare.gov/where-can-i-read-the-affordable-care-act/), Coronavirus Aid, Relief, and Economic Security Act (https://home.treasury.gov/policy-issues/coronavirus/ ), American Recovery and Reinvestment Act, and the American Rescue Plan Act of 2021 (and other previous stimulus packages for said government programs herein).

21. However, there were significant predominate core contractual services delivered by the Defendant that did not meet the contractual and statute obligations for the State of Indiana and the United States Government as depicted in the requirements and specifications referenced in the state and federal government statutes and related contractual provisions above.

22. Employees and subcontractors from the Relator's team and from other ancillary teams delivering services as part of the SDLC raised concerns about the Defendant's violations to the Relator to advocate on their behalf with the Defendant to investigate, stop, and provide relief from said false and fraudulent activities.

23. There was also a request to notify the State of Indiana. The Relator and others acting in protected concerted activities escalated their concerns to several members of the Defendant's leadership team, including the CEO, Talent Management, the Chief Ethics & Compliance Officer, and the Chief Diversity and Inclusion Officer (newly titled Chief

Purpose Officer) to no avail. Unfortunately, the retaliatory tactics increased in scope, severity, hostility, and frequency.

24. The Relator and other employees and subcontractors experienced similar project issues and delays on Defendant's previous and subsequent projects under the broader health and human services system implementation umbrella, including integrated eligibility, children services, and unemployment compensation.

25. The Defendant's system implementation issues have been widely publicized in the news, however, the willful root cause, knowingly orchestrated by exploiting the vulnerabilities of its clients, employees and subcontractors, especially immigrant visa holders, is finally undeniably revealed through the direct experiences of the State of Indiana.

## III. JURISDICTION AND VENUE

26. This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730 in the federal FCA, and the claims under state law in the state FCAs depicted herein.

## IV. STATEMENT OF CLAIM OR ALLEGATION

27. Relator incorporates by reference and realleges, as though fully set forth herein all preceding paragraphs.

28. How does a typical 3 year SDLC lifecycle project result in delays approaching 10 years exceeding millions and millions of dollars in overruns? The simple answer is D - 4. D - 4 or Defendant = Defects, Deceit, Delays, and Dollars is just as explosive and high yielding in its detrimental effects on federal and state governments and the constituencies they seek to serve as C - 4, an explosive used to penetrate and debilitate wartime enemies. In this instance, the war is against corruption.

29. In this time of significant hardship resulting from COVID and other market trends impacting taxpayers, it is critical for the government at all levels, in its economic and constituency confidence rebuilding and recovery efforts, to aggressively recoup funds lost to fraud and punish retaliation efforts, especially from government contractors that are continuing to become an even larger percentage of every taxpayer dollar spent.

30. The mission of the United States Department of Health and Human Services and other supporting Agencies is to protect the health of Americans by offering vital health services to those that are most in need, our most vulnerable populations.

31. Each state also has a Department of Health and Human Services and other supporting Agencies that implements federal policies and implementation guidelines for funding sources. Funding sources for integrated eligibility system modernization projects is typically 90/10 with the federal government providing the majority of funding.

32. This funding mechanism and related methodologies, beginning with lobbying, sales/marketing, service delivery, including the software development lifecycle, cross all public health and welfare software modernizations efforts - integrated eligibility, children services (child welfare and child support), and unemployment.

33. This submission has faced numerous forced delays for years due to the continued nefarious, discriminatory, and retaliatory actions taken by the Defendant and its agents to prevent the corroborated truth from surfacing to ethical authorities protecting the tax payers' best interests.

34. The solutions proposed by auditors and other fact finding entities to address widespread detrimental multi-state and federal fiscal and consumer impacts will not stop the intentional creation of chaos designed to enable nefarious activities while holding their clients hostage to prohibitive transition costs and loss of constituency confidence. Addressing the root cause, systematically, by further closing gaps and "loop holes" in regulations and contractual practices is especially important given the latest fiscal package approved by the Congress and signed into law by the President of the United States in March, 2021.

35. Those awards and the day to day commerce activities to fund government and provide services to constituents will continue to be manipulated if attestation and independence activities do not extend and permeate Defendant's core sales/marketing, implementation, and service delivery practices.

36. If fact, the solutions to further mitigate intentional and unintentional detrimental activities will likely save money and create more simplicity rather than introducing an eye catching new "methodology or practice" or internal or external watchdog that doesn't get at the root cause and will likely, by design, continue to sustain the Defendant's consulting

pricing and cost models for new and recurring business with government, not-for-profits, and private sector clients.

37. The Defendant's actions undermine the positive, beneficial, and necessary goals of innovative public-private sector partnerships, disrespects the caliber of its talent that is acting ethically, and is conduct unbecoming of Fortune's 100 Best Companies to Work For.

**The Case for Indiana**

38. Relator incorporates by reference and realleges, as though fully set forth herein all preceding paragraphs.

39. The State of Indiana determined that in order to provide better service to its constituents an investment in technology must be made to replace the current Indiana Client Eligibility System (ICES).

40. ICES was installed in 1993 and currently supports workers determining eligibility for Temporary Assistance for Needy Families (TANF), Supplemental Nutrition Assistance Program (SNAP), Medicaid, and the Children's Health Insurance Program (CHIP). These programs are administered by the Indiana Family and Social Services Administration (FSSA).

41. The FSSA is responsible for increasing the economic security and self-sufficiency of Indiana families and ensuring the health and safety of its residents by providing essential services and linkages to community resources.

42. The FSSA Division of Family Resources (DFR) has the responsibility for managing the policies for SNAP, TANF, and the eligibility processing and approval for these programs and the Medicaid and CHIP programs.

43. The FSSA Office of Medicaid Policy and Planning (OMPP) is the state's single state agency for Medicaid with responsibility for Medicaid policy. The federal agencies representing these programs include the USDA's Food and Nutrition Services (FNS) agency, the U.S. Health and Human Services (HHS), the Center for Medicare and Medicaid Services (CMS), and the Administration for Children and Families (ACF).

44. As of February, 2019, according to the Centers for Medicare and Medicaid Services, Medicaid provides health insurance coverage to one in five Americans and accounts for nearly one-sixth of all U.S. health care expenditures.

45. This accounts for over $1.3 trillion in ONLY federal funds for health care entitlements and administrative costs.

46. Professional services firms willing to partner with federal and state governments in the implementation and modernization of Medicaid and human services eligibility systems has found this to be a historically lucrative market.

47. The promises of cost savings for federal and state governments through these partnerships were based on industry leading software development lifecycle (SDLC) approaches leveraging open source software.

48. The federal government was an early adopter of open source software.

49. Open source software components allow federal and state organizations to reduce the cost of developing and innovating software by avoiding overburdening internal resources developing functionality that is readily available.

50. Difficult economic and market conditions forced software development teams to do even more with less, and to become even more responsive to customer needs.

51. No matter whether an organization relies on traditional waterfall software development methodologies or more flexible agile development processes, the use of open source code is the key to dramatically speeding software development.

52. Early market entrants like professional services firm Anderson Consulting understood this and realized that for success to be generationally sustainable, open source software had to be coupled with custom development by limited suppliers and an expensive exit strategy.

53. The right leadership style, culture, and a strong subcontractor/alliance strategy had to also be wrapped around this delivery model.

54. The 2018 article written by the Economic Times titled "The Andersen affair: How a firm that went bust 16 years ago created some of the best accounting minds", draws a clear delineation of how those occupying today's leadership positions at professional services firms, including the Defendant, espouse how they've "followed the same principles in every stint" by "sticking to the SOPs learnt" while at Arthur Andersen & Co, the parent of both Arthur Andersen and Andersen Consulting, which was known as a firm with a Midas touch; it was India's best, fastest growing and highest billing professional services firm until it went bust."

55. According to Dani Cohen and Sandra Sowray, "Volkswagen, Enron, Anderson Consulting, McKinsey, and KPMG are – or were – some of the world's best known brands. They are also companies which have been embroiled in corruption scandals, grabbing media headlines for months across the globe.

56. Some are still with us, having weathered the storm, others have been pummeled into oblivion, unable to overcome the reputational damage associated with such a corruption crisis".

57. Unfortunately, this passed down legacy of success means that professional services firms like the Defendant rewarded performance at all costs, even when the Defendant's employees and subcontractors, at the Defendant's direction, cut ethical corners to achieve high performance.

58. The leaders of the Defendant's public sector practice, more specifically the State and Local government service offering, are heritage Anderson Consulting.

59. For more than 20 years, they have implemented Medicaid and human services eligibility systems in over 27 states, including unemployment.

60. In November 2012, FSSA contracted with 20-year incumbent, Defendant, to implement IEDSS, an integrated eligibility solution that will help FSSA caseworkers determine benefits for applicants effectively and efficiently.

61. Defendant maintained and enhanced large-scale, FAMIS certified, online automated system (ICES) that supported caseworkers administering eligibility programs, including temporary assistance for needy families (TANF), medical assistance (MA), supplemental nutrition assistance program (SNAP), and refugee assistance programs.

62. Scope of services also included integration and connectivity of ICES to other agencies to better administer child care, child welfare, fair hearings, and Indiana work programs. Defendant used its HHS NextGen as the base solution for IEDSS.

63. Defendant's HHS NextGen solution combines commercial off the shelf (COTS) tools with transfer assets to deliver a full suite of HHS functionality.

64. It is built upon a service-oriented architecture (SOA) based technical foundation.

65. Familiar attributes for Defendant's offering also included:

(1) Open source software from Montana and Connecticut at zero to minimal costs coupled with a significant custom development estimate from Defendant for over 40% of the business requirements. This is where Defendant's predatory tactics begin to beat forecasted new and recurring revenue targets with the desired outcome being an "enterprise operating model", (2) aggressive implementation timeline with expensive exit/transition strategy, (3) heritage Anderson Consulting leadership team and style representative of close to 100%, (4) vulnerable immigrant South Asia culture representative of close to 100% with prevalent HB1, L1, and other visas, (5) long term subcontractor/alliance relationships servicing multiple Defendant projects, including Indiana, complicated by mandated MBE/WBE requirements, and (6) deep domestic and international capabilities and market penetration.

66. While Defendant offered numerous qualifications, including being uniquely qualified with 20 years of incumbent knowledge and skills, that should have enabled the State of Indiana to implement IEDSS collaboratively and with minimum disruption to caseworker everyday workload, Defendant failed to deliver on key aspects of its value proposition to the State of Indiana, including leveraging its deep knowledge of implementing and remediation experience from prior integrated eligibility system implementations, effectively and efficiently leveraging incumbent knowledge, and delivering, in a collaborative and transparent manner, on agreed upon project objectives and DDI principles.

67. There were also several market disruptors impacting Defendant, including, but not limited to, (1) Patient Protection and Affordable Care Act money drying up, (2) market share loss in ancillary Health and Human Services areas, including CCWIS and Unemployment bids, (3) need to subsidize or offset "credits" or other penalty payments from faulty projects or market conditions impacting commercial and private sector sales (2008 financial crisis; COVID), especially those that made public news headlines so that Defendant could maintain #1 market position and compensation payments to executives, etc., and (4) Trump's immigration reform actions targeting U.S. Citizenship and Immigration Services' (USCIS) enforcement of eligibility requirements for H-1B visas, which are designed for certain skilled workers such as those employed in the technology industry, as well as L-1 visas, which are

meant for executives who work for large corporations (i.e. double digit increases in visa denials beginning in 2015 through 2020 (30%)).

68. Technology is a critical driving force improving the health and welfare of taxpayers, beginning with early childhood nutrition programs to adult and family healthcare insurance programs.

69. According to recent research at Judge Business School at Cambridge University, the global cost of debugging software has risen to $312 billion annually.

70. The research found that, on average, software developers spend 50% of their programming time finding and fixing bugs.

71. When projecting this figure onto the total cost of employing software developers this inefficiency is estimated to cost the global economy $312 billion every year; this includes costs associated with the delay in delivery of products and services.

72. The implications for federal and state software implementation projects are much higher.

73. According to fifty-year industry expert in developing software in the commercial and government sectors, Gregory Pope, "detecting software errors early is important since it more effort is needed to fix bugs when the system is nearing launch, and — due to the interactive nature of components in the system — one small bug in a particular component hidden deep within layers of code can result in an effect that is magnified several times over on a system-level."

74. Traditionally, healthy projects demonstrate an amount of rigor for the SDLC process that is at least proportional to the severity of the consequence of failure of the software being built.

75. Defendant's failure to fully deliver for the State of Indiana was deliberate and long-standing and has resulted in millions of dollars in cost overruns and degraded service deliver to Indiana families dependent on these services.

76. The victims of this failure not only extend to Indiana families dependent on these benefits and services, but to job seekers and existing project employees and subcontractors, including vulnerable immigrants seeking corporate sponsorship for employment and citizenship and ultimately, the United States tax payer.

77. Sadly, Defendant's role as a government contractor implementing solutions to service those most vulnerable populations seeking federal and state health benefits and other ancillary services, increases its burden since the true implications of its actions shouldn't be measured purely in cost and time. Some specific contractual violations, including FCA and state FCA statutes depicted herein, alleged by the Relator include:

78. (1) Relator incorporates by reference and realleges, as though fully set forth herein all preceding paragraphs.

79. (2) Counter to contractual requirements and Defendant's proprietary EVD approach, Relator alleges that Defendant leadership directed developers and testers to violate industry standards of lines of demarcation and segmentation of duties, including eliminating or pushing work requirement downstream to other Defendant's teams that also circumvented the testing lifecycle. Defendant leadership deliberately shifted standards from "comprehensive" to "limited" by dictating arbitrary limits to work efforts and changing the scope of work.

80. In addition to written and verbal statements detailing worker constraints and directions to create and report fraudulent records, removing access from employees to prevent them from working and/or communicating fraudulent activities to others, cultivating a hostile work environment, and silencing and retaliating against employees raising concerns, Defendant leadership stated, when asked why defects weren't allowed to be logged, "it is UAT's problem now."

81. This willful action created cumulative downstream costs and risks of remediating failures, including costs to third party vendors (iLab, etc.) and most unfortunately, State of Indiana end users, including caseworkers, required to comprehensively "test" the system while in production trying their best to service clients in this sub pair service delivery situation.

82. Even given the quality impacts resulting from the deliberate omission, falsifying, and misclassification of defects and other recordkeeping documents reported to state and federal agencies overburdening downstream processes prior to production, the remnants remain at the forefront post go-live with an average overage of 10 reported material defects a day officially reported post-production and subject to the same omissions and misclassifications processes by the Defendant.

83. (3) Relator alleges that Defendant deliberately violated contract language requiring effectiveness/efficiencies to be brought forward in a transparent way.

84. The federal government's open source software goal to reduce the costs of developing and innovating software, to avoid overburdening internal resources developing functionality that is readily available, to become more responsive to customer needs, and to dramatically accelerate software development has been deliberately undermined by the Defendant for monetary and market gains.

85. The Defendant's "predatory" practices are targeted at several phases of the SDLC, including the sales process that begins with the selection of a transfer solution from another state.

86. During this process, the Defendant has the responsibility to fully disclose the current state of the transfer solution and the implications of modifications to the transfer solution. Instead, the Defendant's focus is on exploiting custom development opportunities. In the case of the State of Indiana, the Defendant violated its contractual obligation by not transparently educating and providing full documentation on the transfer solution and risks associated with custom development performed by the Defendant.

87. The Defendant required the State of Indiana to provide its requirements without this foundational requirement. As a result, the Defendant's requirements analysis in the procurement and sales process resulted in an estimated 40% of custom development.

88. A logical conclusion in the sales process is that a transfer solution has been stabilized in production for some time.

89. Therefore, any code modifications resulting in defects are introduced by the Defendant.

90. These defects, without proper industry approaches to code review prior to moving to future phases, including production, also corrupt the stabilized transfer solution thereby eroding the benefits of the federal government's initial investments to States and other entities leveraging this governmental asset.

91. These effects compound in scope and impact throughout the project lifecycle and the resultant services delivered by caseworkers to their constituencies in terms of system and process performance and accuracy degradation.

92. As federal and state funding opportunities continue to avail themselves, development and testing activities continue in multiple states by the Defendant.

93. Thus, contractual and statute obligations to be transparent about new foundational defects surfaces, especially when there are development and testing activities that do not meet industry standards and or false and fraudulent activities impacting these phases of the SDLC exist within the Defendant's operations.

94. In additional to documented evidence of false and fraudulent activities, the Relator alleges being introduced to the Defendant's specialist leader supporting Defendant's portfolio of integrated eligibility systems across several States on a teleconference with Defendant's project leadership in preparation to meet State of Indiana leadership and to conduct "end user focus groups" across the state.

95. During the call, the Defendant's specialist leader concluded that "she probably won't be surprised by what she identifies" in the State of Indiana "since there are several known issues with HHS NextGen in several other states".

96. Defendant's subject matter expert was asked by Relator, "why known issues haven't been addressed across the board?" and the reply was that "she didn't know why". Follow-up conversations by the Relator with Defendant's project leadership yielded similar results.

97. This equates to a deliberate withholding of critical information for profit by failing to remediate issues identified in cure plans and root cause analysis within and across projects and as part of industry and EVD standards, including retrospectives shared with client that deliberately exclude actions to remedy and close gaps in meeting contractual requirements, including regression testing and Defendant's employees expressing concerns and issues with Defendant's key leadership decision making impacting the successful delivery of services to the State of Indiana.

98. Fifty-year industry expert in developing software in the commercial and government sectors, Gregory Pope, shed light on the critical downstream impacts of the Defendant's negligence and deliberate inaction.

99. Specifically, conducting a "RCA (Root Cause Analysis) is a mechanism of analyzing the Defects, to identify its cause. We brainstorm, read and dig the defect to identify

whether the defect was due to "testing miss", "development miss" or was a "requirement or designs miss".

100. When an RCA is done accurately, it helps to prevent defects in the later releases or phases. If we find, that a defect was due to design miss, we can review the design documents and can take appropriate measures.

101. Similarly, if we find that a defect was due to testing miss, we can review our test cases or metrics, and update it accordingly.

102. RCA should not be limited only to testing the defects. We can do RCA on production defects as well. Based on the decision of RCA, we can enhance our Test Bed and include those production tickets as Regression Test cases.

103. This will ensure that the defect or similar kinds of defects are not repeated.

104. It is different from defect analysis, troubleshooting, and other problem-solving methods as these methods try to find the solution for the specific issue, but RCA tries to find the underlying cause."

105. Defendant's willful actions also significantly and materially degraded and erodes the benefits of the United States Government adopting an open source software approach to save taxpayer money and minimize disruption to state operations and their constituencies receiving benefits and ancillary human services.

106. (4) Relator alleges that Defendant's misclassification of information migrates from the SDLC development and testing phases to the post-implementation phase.

107. Defendant shifts employees and subcontractors responsible in the earlier phases to later phases.

108. This includes consistently misclassifying production tickets submitted by end users that result in warranty work or new change orders.

109. This misclassification also materially misrepresents the production impacts to end users and the resolution rate.

110. This was reported to leadership in weekly reports with no action being taken to resolve the root cause.

111. As an example, there are were approximately 587 production defects linked to change orders and regression testing in JIRA.

112. JIRA is a "shadow" system for Defendant's employee's only.

113. This "shadow" system also enables Defendant to avoid reporting the use of offshore developers and testers. Defendant literally shows clients a PowerPoint slide titled "Defendant US", however, one of the locations is India, thereby also possibly avoiding disclosure of other suppliers since Defendant India is another LLP.

114. (5) Relator alleges that Defendant only reports on "trends" derived from similar tickets and not the full impacts of a defect by querying the production database.

115. A comprehensive impact analysis and code review is not conducted unless specifically requested by the State of Indiana. The quality and integrity of this analysis continues to be subject to the existing Defendant practices described previously.

116. This results in continued under reporting of issues impacting benefits eligibility and enrollment.

117. (6) Relator alleges that Defendant failed to meet agreed to go/no-go standards and continued to report otherwise to the State of Indiana and other federal authorities involved in approval processes.

118. Specifically, Relator alleges that members of project leadership communicated to senior project leadership in a meeting that Defendant continued to have critical defects in the final go/no-go status reporting to State and federal authorities.

119. Senior project leadership communicated to meeting attendees that the "client was unaware, Defendant would be subject to a .5M penalty, and no one should share this with the State".

120. Defendant also failed to meet contractual and go/no-go standards derived from their EVD testing processes, from unit to UAT, resulting in increased downstream production costs and service degradation in delivering accurate and timely benefits eligibility and enrollment services.

121. (7) Relator alleges Defendant violated Contingent Worker Services (CWS), subcontractor, and MBE/WBE policy and contractual requirements, including project leadership entertaining select subcontractors as a coercion tactic and purchasing and gifting excessive alcohol that couldn't be consumed on premises and inaccuracies in worker employment statuses and direct employer impacting invoices and billings.

122. (8) Relator alleges Defendant's leadership colluded to force employees and subcontractors to implement tactics designed to be less competent and transparent and to

artificially inflate and mislead causation and progress of production support issues reported to the State of Indiana and the federal government, including coercing employees and subcontractors to adopt less effective and efficient tools and staffing model used in other FCA states, resulting in employees and subcontractors expressing concerns about feeling pressured to commit fraudulent work activities.

123. (9) Relator alleges Defendant knowingly violating "key person" contractual requirements geared to protect federal and state interest, including violating notification requirements and substitution requirements with employees that did not meet the selection and qualifications of a "key person" and misleading state and federal auditor functions in verbal and written responses to audit reports (IVV and DCAA) and applicable invoicing and billing, etc.

124. (10) Relator alleges violation of independence and PCAOB guidelines and requirements, including conflicts of interest, code of ethics violations, and qualifications of professionals, including Defendant's own subject matter experts publicly raising serious concerns in verbal and written documentation about "decision making" of the Defendant's leader ultimately responsible for the product and service delivery failures experienced by the state during a mandated after action review by the State of Indiana.

125. Defendant's leader presented an after action review with material omissions to the State of Indiana. A member of the Relator's team escalated contractual violations and a conflict of interest to the Defendant's Ethics Hotline.

126. The Ethics Hotline, managed by the Chief Ethics and Compliance Officer, directed the employee back to the source of the escalation. The Relator tried to identify other opportunities to get help, including the United States Public Company Accounting Oversight Board (PCAOB), established by Congress in the Sarbanes-Oxley Act as a non-for-profit watchdog, overseen by the United States Securities and Exchange Commission (SEC), and the Ethics and Compliance Initiative (ECI), another not-for-profit governing the practices of the Defendant, however, the Defendant's Chief Ethics and Compliance Officer referenced above that took no action is on one of the Board of Directors.

127. Similar conflicts of interest existed throughout this process where Defendant's employees and subcontractors were seeking relief.

128. (11) Relator alleges Defendant aggressively sought to obstruct justice and cover up its state and federal violations by deploying an illegal cybersecurity and surveillance program, Defendant's Insider Threat Program, aided by employees and subcontractors receiving "quid pro quo" for weaponizing false narratives, primarily with racial stereotypes, and other private sector companies contracted with the Defendant, collectively designed by the Defendant to use fear and other threatening tactics that put the Relator and anyone interfacing with the Relator in actual and perceived danger and hopefully undermine and subside attempts to provide evidence to the state and federal government within established protocols and time limits, including exploiting state and federal service delivery and technology performance degradation during the COVID pandemic.

129. (12) Relator alleges Defendant violated the civil and privacy rights of active and retired government employees, including local, state, and federal active duty service members by inspecting personal or home computers, personal email accounts, personal telephones, and any other personal electronic storage devices, inappropriately exposing personal tax and other financial information, and demanding payments for Relator's substantiated wages/compensation paid and reported by the Defendant.

130. Defendant also exploited loop holes in consumer protections governed by the Federal Trade Commission (FTC) and the Consumer Financial Protection Bureau (CFPB). Defendant also used similar retaliation tactics against other employees that expressed concerns and sought to leave the State of Indiana project or were acting in protected concerted activity.

131. Defendant pursued the collection of a previously approved payments from another employee stating that they "would overlook" fake "expense audit results if they agreed to release liability".

132. (13) Relator alleges that Defendant's self-created chaos to mask "predatory" practices also extended to its internal company practices, specifically time and expense management processes designed to exploit and retaliate against employees with the prevailing purpose of repurposing employees' wages, compensation, and fringe benefits as Defendant saw fit to subsidize Defendant's finances, "double dipping", and manipulating revenue recognition and cash flow management practices governed by the Financial Accounting Standards Board's (FASB) standards for professional service companies,

including the identification of performance obligations in contracts and statutes, accounting for variable consideration, revenue recognition methodologies, accounting for contract modifications, and other revenue generating and cash flow management practices governed by federal, state, and localities' contracts and statutes.

133. (14) Relator alleges Defendant colluded with and directed third party suppliers to obstruct justice by presenting false information on the Defendant's behalf to state and federal officials. Defendant also implemented internal policies to delete evidence, including emails, despite state and federal records retention requirements.

134. (15) Relator alleges Defendant deployed coercive and hostile tactics to dissipate issues being raised throughout the SDLC, including shaming, isolating, and forcing out of employees that raise issues contrary to management direction, including retaliatory tactics impacting state and federal agencies, i.e. removing all work from the employees while continuing to bill hours to the State of Indiana, book employee and subcontractor earnings, and non-payment of approved reimbursable expenses where the mandated corporate card joint liability agreement lacks independence, full disclosure of contractual provisions, and denies industry consumer protection disputes, investigative, and recordkeeping processes.

135. (16) Relator alleges Defendant instructed employees and subcontractors "to not tell the State about or mention DES, an offshore team conducting development and testing.

136. (17) Relator alleges Defendant violated federal and state requirements for employers who are receiving federal government assistance that must provide attestations that in seeking the H-1B visa, that they have not unlawfully displaced U.S. workers. Defendant manipulated visa standards and embolden discriminatory employment practices (isolating, impeding, excluding, and demoting non-South Asian employees) by favoring and exploiting the vulnerabilities of South Asians (over 90% visa requests with 1% from China) to fill jobs that had been and could be performed by US employees and in most cases did not require special knowledge or "on the job training" was available, prolonged visa status holders tenure and/or award of green cards, provided more favorable performance reviews and accelerated promotions creating disparate impacts for non-South Asian project employees and subcontractors.

137. This constitutes as "quid pro quo" for the Defendant leadership directly supervising employees and subcontractors where fraudulent activities were taking place,

artificially elongating recurring revenue and new business opportunities, including crisis management and advisory consulting revenue for the self-created chaos and crisis Defendant willfully created and cultivated.

138. (18) Relator alleges constant fear among visa holders and/or those being sponsored by Defendant for green cards that they may receive "bad" performance reviews that jeopardize eligibility and status if they spoke up for others as an "ally".

139. One instance in particular involved bringing together key members of the Defendant's testing and technology teams to understand why and propose a solution for the lack of sessions based testing.

140. When this issue was raised by an employee, the employee was publicly told in a yelling, loud voice to "shut up" by Defendant. The witnessing employees and subcontractors were so shocked and taken a back that there was a haunting silence and the meeting abruptly adjourned.

141. This fundamental functionality, used on previous projects, didn't get implemented for at least 3 years after it was brought to the Defendant's leadership team numerous times, including multi-state leaders. Unfortunately, this lack of necessary support tools continues to be non-existent on other Defendant projects, including more recent implementations.

142. (19) Relator alleges Defendant communicated, written and verbal, directives to stop submission of defects during testing cycle, including cutting off environment and ticket submission access by employees and subcontractors.

143. (20) Relator alleges Defendant failed to timely implement Defendant's EVD environment standards (several years' delay), including sessions and time travel environments, impacting productivity, accuracy of time reporting, and quality.

144. (21) Relator alleges Defendant manipulated subcontractor and employee timesheets to lesser hours worked and reported.

145. (22) Relator alleges Defendant deployed predatory practices, especially for OEDC and strategic clients experiencing "cure plans", to further exploit and secure increased revenues and scope.

146. (23) Relator alleges Defendant conducted recurring discriminatory and retaliatory practices directed at state officials and staff, gender and race related, by Defendant's leadership, including an internal "catch and release" tokenism strategy designed to secure

multiple state contracts without demonstrating a legitimate commitment to the goals and objectives of the state and federal government.

147. (24) Relator alleges Defendant provided misleading and inaccurate information to the State of Indiana to abet a 'coup' on the State project leadership side to shift blame for delays and to avoid meeting continued demands for accurate development and testing staffing and performance metrics.

148. (25) Relator alleges Defendant denied the State of Indiana requested testing support for caseworker UAT when Defendant was on time and materials and fixed price arrangements.

149. (26) Relator alleges Defendant provided inaccurate reporting of contingency worker and employee status and representation resulting in inaccurate time and materials billing and overpricing of fixed price statements of work.

150. (27) Relator alleges Defendant violated protected concerted conduct by employees and subcontractors, including refusal of hire, denial of representation during disciplinary actions, withholding of pay and benefits, adverse changes in employment status, unlawful work rules, statements of threats and inciting workplace violence, polling, creating impression of and conducting surveillance, and surveilling of personal property.

151. (28) Relator alleges Defendant failed to implement Defendant's EVD and other best practices for Integrated Eligibility projects defined in contract resulting in a project plagued by multiple delays since project inception in 2012 and a cost overrun of over 120 million dollars and continued million dollar costs for IEDSS development and maintenance services due to inability to decommission. Even though Defendant was incumbent vendor providing existing integrating eligibility system for maintenance and operations, they dramatically exceeded the typical modernization implementation timeframe.

152. (29) Relator alleges, as of recently as the 1st quarter of 2020, Defendant's senior leadership continued to secure state and federal funding, including COVID-related initiatives and continued said contractual violations, including FCA and state FCA statutes. These statements are supported by historical documentation since project inception in 2013 to date and the following performance indicators:

- Multiple delays resulting in one of the longest, if not the longest, project cycle among 27 states implemented by Defendant.

- Typical project life cycle is no more than three years.
- Over 3K known production defects or average of 10 per day.
- Over 946 interim business processes, excluding workaround not formally approved by the State of Indiana or federal authorities.
- Over 3K data fixes or average of 11 per day.
- Over 14K incidents reported by caseworkers or average of 53 per day.

153. (30) Relator alleges, based on similar multi-state outcomes, that Defendant's practices extend to other state ancillary projects previously or currently governed by the same account leadership and project methodologies.

154. (31) Relator alleges that Defendant's unethical activities, also include circumventing requirements put in place to avoid another Enron and Anderson Consulting debacle.

155. Good faith partnership rotations and whistleblower hot lines designed to identify opportunities to proactively and effectively address unethical activities without intervention by overburdened federal and state regulatory agencies have failed.

156. Conflicts of interest and retaliatory actions have been employed numerous times, including escalations to CEO, without resolution.

157. Programs touted by Defendant as "ally" or "affinity" programs became "informant" programs where employees believing they were doing what Defendant expected and became victims of retaliation themselves along with the impacted employee.

158. A Defendant senior leader actually demanded another employee and subcontractor and to "handle" employees that raised legitimate issues about work constraints stating "is he trying to start a union?"

159. The human resources department, Defendant Talent Management, has also become a corporate policing function emboldening further retaliatory practices by taking no action or modeling retaliatory behaviors.

160. Thus, the Congressional actions to prevent further fraud and restore confidence in the financial markets, with the passing of the Sarbanes-Oxley Act of 2002 to address Big 5, now Big 4 firms complacent or complicit role in recent corporate mega-scandals hasn't increased the confidence of a demoralized public.

161. (32) Relator alleges that Defendant's execution of the entire SDLC project life cycle is designed to deceptively create opportunities for new and recurring revenue.

162. Given the advent of open course code from prior governmental investments to protect tax payer's investment, Defendant would be hard pressed to meet its quarterly and annual profitability targets.

163. Specific "webs of deception" exist in the requirements phase of the project as described above.

164. Defendant knowingly uses novice practitioners to document "new" requirements and conduct most of the primary tasks required to be in compliance.

165. The key question is why are there so many "new" requirements for a transfer solution based on the same federal guidelines?

166. While there are some states with supplemental programs that require "new" requirements, the overall scope is minimal and incidental.

167. The real money is made by conducting meetings with the state officials starting with a relatively blank piece of paper rather than showing them what exists and asking "why not, is there a reason why this won't work?"

168. Defendant is also conducting the "gap analysis" in the preliminary stages to access "new requirements".

169. The Defendant employee conducting the design sessions are typically new to the product and are participating internally in a pseudo "on the job" training at the government's expense.

170. The requirements gathering methodology, now recently rebranded as "human centered" design, on its surface seems "customer friendly", however, that approach undermines cost saving approaches implemented by the government for modernization projects, if it isn't intentionally conducted in a certain way.

171. This will plague the savvier agile approaches if not executed in a specific, simplistic way.

172. Defendant's employees and subcontractors on the development and testing teams frequently joked about being "lost" among themselves.

173. When these concerns were brought to Defendant senior management, they were shut down verbally and physically, including comments from leadership about suppressing "union" activities.

174. This lack of knowledge flows downstream to production support and is a violation of contractual requirements, including state and federal laws governing Big 4 companies.

175. The recent H1 legislation proposed by Congress is designed to mitigate conflicts of interest in campaign financing and other congressional and governmental financing, however, the focus is primarily on congressman serving on private sector boards.

176. There is an opportunity to extend this to government officials and government contractors.

177. The State of Indiana is the tip of the iceberg. What lies beneath is a history of crossing ethical lines and avoidance of safeguards put in place to prevent the corruption that resulted in the prosecution of Enron and Anderson Consulting.

178. (33) Relator alleges Defendant systematically and intentionally favors the hiring, retention, and ongoing sponsorship of employees that are not experienced industry hires. Defendant's "cloning" culture allows the exploitation of novice employees that are groomed, knowingly and unknowing, to continue nefarious, including false and fraudulent practices, cultivated by Defendant leadership. These employees and subcontractors are deployed to future projects thereby compounding and making pervasive practices that undermine the government's interests. Defendant's false and fraudulent practices are metastasized throughout the organization.

**Other Similarly Situated States**

179. Relator incorporates by reference and realleges, as though fully set forth herein all preceding paragraphs.

180. Rhode Island's circumstance again demonstrates that state and federal agencies partnering with Defendant for software implementation services are held hostage and aren't being derelict in their duties by "turning a blind eye".

181. The enormously prohibitive transition costs and public shame of a deservingly failed contractual relationship forces a monopolistic situation with limited remedies of creating real, sustaining systematic change in the vendor's practices.

182. Jason Bramwell, an investigative journalist for the news outlet Growing Concern, reports in his article, Rhode Island Believes In Second Chances, Even for Defendant, that "back in January 2017, Rhode Island was pissed at Defendant because, when the state rolled out a new computer system in September 2016 that the firm designed, it had more bugs in it than a Florida swamp."

183. The computer system—known as the Unified Health Infrastructure Project (UHIP)—was supposed to streamline benefits, such as Medicaid, food stamps, and child-care assistance for hundreds of thousands of Rhode Islanders.

184. Instead, UHIP was a complete disaster: residents reported missing benefits, hours-long call wait times to the state's Department of Human Services, and long lines at DHS field offices, among other problems.

185. Two and a half years later, Defendant continues to work on improvements to UHIP because the system still isn't working the way it should.

186. Because Defendant "gave them a piece of crap computer system", Rhode Island has not paid the firm since the failed rollout, according to the Providence Journal.

187. At the time, Rhode Island Governor Gina Raimondo called UHIP "disappointing, it's been frustrating, and it's been unacceptable."

188. Defendant apologized publicly to Rhode Island lawmakers for the UHIP fiasco last April, saying it would have probably been a better idea to pilot the system first before flipping the switch to make it go live.

189. So, when Defendant's contract with Rhode Island was about to expire at the end of March, Raimondo was faced with the decision on whether to renew it or not. She did, because "Rhode Island would be better off financially sticking with Defendant", according to the Providence Journal.

190. Given that Defendant has already provided $87 million in "credits" to the state, plus the $75 million in estimated "discounts" going forward and the $50 million in cash payments, that adds up to a total of nearly $212 million in concessions by Defendant to Rhode Island, according to the Providence Journal.

191. In a March 21st editorial, the Providence Journal wrote that "Rhode Islanders are pretty much caught in a rock and a hard place due to the state's new deal with Defendant."

192. The Rhode Island Governor's depiction of Defendant's system having "more bugs in it than a Florida swamp" is unfortunately "déjà vu" for Florida's Governor and his other state counterparts contracted with Defendant too, including Ohio, Oregon, Illinois, Indiana, Kentucky, Arkansas, California, Rhode Island, Tennessee, Michigan, and Alaska to name a few.

193. These are only some examples made public and this is primarily focused on the Integrated Eligibility system implementations, however, the Defendant's EVD model sold to clients as their "differentiator" and what makes them better than other vendors the terms of their methodology and documentation is used across other public sector projects, including unemployment, child welfare, and child support.

194. Not only is the approach and tools predominately the same, Defendant's leadership is also leveraged.

195. As in the recent lawsuit against McKinsey & Company for its role in helping to "turbocharge" opioid sales, Defendant has profited off of their clients and taxpayers in contracts by not revealing conflicts of interest or by deliberately selling and marketing products and services that encourage the violation of laws, including their performance management program, D&I program, and its ethics and compliance program.

196. Publicly, Defendant sits on not-for-profit boards with direct access to key law and policy makers while deliberately, knowingly internally implementing and selling/marketing to their clients approaches that willfully undermine these laws designed to protect citizens and government investments.

197. In the last year, Defendant swiftly moved forward with measures to avoid detection of their fraudulent activities by implementing restrictive retention policies for emails to be automatically deleted by the company.

198. Unfortunately, the March 4, 2021 report released by the Michigan OIG surfaces some of these same points, but doesn't get to the actual willfulness of Defendant's systemic practices. Defendant has been successful over the last year to circumvent whistleblowers long before this investigation and report.

199. Hopefully, the newly appointed DOJ officials and their state counterparts will get the opportunity to review and analyze these allegations and seek justice for governmental officials and the taxpayers.

200. It is the same decades old "shell game" played over and over since its "rebirth" as Defendant. The only difference now is that the State of Indiana provides solid indisputable proof of the relevance and weight of Defendant's pervasive and explosive fraudulent, corruptive, collusive, coercive, and obstructive practices.

201. Relator incorporates by reference and repeats and realleges each allegation, as though fully set forth herein all preceding paragraphs, as violating the Federal False Claims Act (31 U.S.C. § § 3729(a)(1)(A), (a)(1)(B), (a)(1)(G)), and (b)(3) and 42 U.S.C. § 1320a-7k(d)(1)), California False Claims Act (CFCA 12651(a)(1),(a)(2), (a)(7), (a)(8)), Florida False Claims Act (FS § § 68.082(2)(a), (2)(b), (2)(g)), Georgia False Medicaid Claims Act (GS § § 49-4-168.1(a)(1), (a)(2), (a)(7)), Illinois False Claims Act (740 ILCS § § 175/3(a)(1)(A), (a)(1)(B), (a)(1)(G)), Indiana False Claims and Whistleblower Protection Act (IC § § 5-11-5.5-2(b)(1), (b)(2), (b)(6)), Indiana Medicaid False Claims and Whistleblower Protection Act (IC 5-11-5.7-2(a)), Louisiana Medical Assistance Programs Integrity Law (LS § § 46:438.3(A) and (B)), Michigan Medicaid False Claims Act (MS § 400.607(1) and (3)), Oregon False Claims (ORS 180.755 and ORS 180.760), Rhode Island False Claims Act (RI Chapter 1.1 § § 9-1.1-3(a)(1), (a)(2), and (a)(7)), Tennessee Medicaid False Claims Act (TS § § 71-5-182(a)(1)(A), (a)(1)(B), (a)(1)(D)), Washington Medicaid Fraud False Claims Act (WS RCW 74.09 § § 202(1)(a), (1)(b), and (1)(g)), and in any jurisdiction to which the Defendant's misconduct has extended where state FCAs exist.

## V. RELIEF

202. Relator incorporates by reference and realleges, as though fully set forth herein all preceding paragraphs.

203. Relator requests all available remedies, including Defendant fines, damages, and penalties, whistleblower awards, and whistleblower protections, available through the Federal False Claims Act (31 U.S.C. § § 3729, et seq., as amended, the Indiana False Claims Act and Whistleblower Protection Act (IC 5-11-5.5, et seq, as amended), the Medicaid False Claims and Whistleblower Protection Act (IC 5-11-5.7 et seq, as amended), and in any jurisdiction to which the Defendant's misconduct has extended where state FCAs exist, including but not limited to up to 30% of total contract value from 2012 to date and any for any other human services projects subject to other states FCA statutes, including California

(AB 2570; CFCA § § 12650, et seq), Florida (FS 68.081,et seq), Georgia (GS § § 49-4-168. et seq), Illinois (740 ILCS § § 175/1, et seq), Indiana (IC § § 5-11-5.5, et seq and IC 5-11-5.7, et seq), Louisiana (LS § § 46:437.1, et seq), Michigan (MS § § 400.601, et seq), Oregon (ORS 180.760, et seq and ORS 180.785, et seq), Rhode Island (RI Chapter 1.1 § § 9-1.1-1, et seq), Tennessee (TS § § 71-5-181, et seq), and Washington (WS RCW 74.09 § § 101, et seq), that procured with the Defendant leveraging similarly situated scope, products, services, methodologies, and human capital.

204. As an example, the State of Indiana publishes all contractual details, including total contract value and invoicing and billing documentation, for human services projects herein awarded to the Defendant and its affiliates at https://www.in.gov/idoa/procurement.

205. Relator requests all available remedies, including Defendant fines, damages, and penalties, whistleblower awards, and whistleblower protections, available through SEC and IRS provisions of the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, and the Tax Relief and Health Care Act and any other applicable statute sections and amendments.

206. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

207. A summary of counts against the Defendant is depicted below.

**Count Details**

208. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

## Count I

## Federal False Claims Act
## 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)
## (any other applicable statute sections and amendments)

209. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein. This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

210. Through the acts described above, Defendants have knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

211. Through the acts described above, Defendants have knowingly made, used, or caused to be made or used, false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

212. The United States Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to make payments to the Defendant and any other downstream affiliate and third party providers that would not be paid but for Defendant's unlawful conduct.

213. As a result of the Defendant's acts, the United States Government has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

214. Additionally, the United States Government is entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

**Count II**

**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**(any other applicable statute sections and amendments)**

215. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein. This is a claim for penalties and treble damages under the Federal False Claims Act, 31 U.S.C. §§ 3729, eq seq., as amended.

216. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the federal government, within the meaning of 31 U.S.C. §§ 3729(a)(1)(G).

217. An overpayment from a government payment program received by a provider in excess of the amount that is due and payable, including any payment for non-covered items

or services that are not reasonable and necessary in accordance with Medicare rules, must be promptly remitted by the provider.

218. Even when an overpayment is received through an innocent billing error or through mistake of the contractor, 42 USC 1320a – 7k(d)(1) provides that "returning the overpayment … is an obligation as defined in 3279(b)(3) of the title 31 for purposes of section 3729 of such title."

219. Defendant are aware that the conduct described herein has resulted in the submission of invoices and billings to government programs for payment to which Defendant and any other downstream affiliate and third party providers are not entitled. Defendant have knowingly and wrongfully retained overpayments.

220. On and after 2010, the effective day of the legislation that established subsection 7k(d)(1) referred to above, each day that Defendant have retained such an overpayment is a separate violation of the FCA.

221. As a result of Defendant's acts, the United States Government has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

222. Additionally, the United States Government is entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government.

## Count III

## California False Claims Act
## (Government Code §§ 12651(a)(1) and (a)(2))
## (any other applicable statute sections and amendments)

223. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

224. This is a claim for treble damages and penalties under the California False Claims Act, Government Code §§ 12651, et seq., as amended.

225. Through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of California, within the meaning of California Government Code § 12651(a)(1).

226. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false or fraudulent records and statements, and omitted material facts, to get false and fraudulent invoice or billing paid or approved, within the meaning of California Government Code § 12651(a)(2).

227. The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to make payments to the Defendant and any other downstream affiliate and third party providers that would not be paid but for Defendant unlawful conduct.

228. As a result of Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

229. Additionally, the State of California is entitled to the maximum penalty of $10,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent invoice or billing made and caused to be made by Defendant and any other downstream affiliate and third party providers, arising from their unlawful conduct as described herein.

**Count IV**

**California False Claims Act**
**Government Code §§ 12651(a)(7)**
**(any other applicable statute sections and amendments)**

230. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

231. This is a claim for treble damages and penalties under the California False Claims Act, Government Code §§ 12650, et seq.

232. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of California, within the meaning of California Government Code § 12651(a)(7).

233. As a result of Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.at trial.

234. The State of California is also entitled to the maximum penalty of $10,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent invoice or billing made and caused to be made by Defendant and any other downstream affiliate and third party providers, arising from their unlawful conduct as described herein.

**Count V**

**California False Claims Act**
**Government Code §§ 12651(a)(8)**
**(any other applicable statute sections and amendments)**

235. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

236. This is a claim for treble damages and penalties under the California False Claims Act, Government Code §§ 12650, et seq., as amended.

237. Through the acts described above, Defendant has become at least the beneficiaries of the inadvertent submissions of false invoices and billings.

238. Notwithstanding Defendant knowledge that they are the beneficiary of such invoices and billings, Defendant have failed to disclose the invoicing and billings to the State within a reasonable time after their discovery within the meaning of California Government Code § 12651(a)(8).

239. As a result of Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

240. The State of California is also entitled to the maximum penalty of $10,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent invoice or billing made and caused to be made by Defendant and any other downstream affiliate and third party providers, arising from their unlawful conduct as described herein.

**Count VI**

**Florida False Claims Act**
**Florida Statutes §§ 68.082(2)(a) and (2)(b)**
**(any other applicable statute sections and amendments)**

241. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

242. This is a claim for treble damages and penalties under the Florida False Claims Act, Florida Statutes §§ 68.081, et seq.

243. Through the acts described above, Defendant has knowingly present or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Florida, within the meaning of Florida Statutes § 68.082(2)(a).

244. Through the acts described above, Defendant have knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent invoices and billings paid or approved, within the meaning Florida Statute s § 68.082(2)(b).

245. The State of Florida, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

246. As a result of Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

247. The State of Florida is also entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count VII**

**Florida False Claims Act**
**Florida Statutes §§ 68.082(2)(g)**
**(any other applicable statute sections and amendments)**

248. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

249. This is a claim for treble damages and penalties under the Florida False Claims Act, Florida Statutes §§ 68.081, et seq.

250. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false or fraudulent records and statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Florida, within the meaning of Florida Statute s § 68.082(2)(g).

251. The State of Florida, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

252. As a result of Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

253. The State of Florida is also entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count VIII**

**Georgia False Medicaid Claims Act**
**(Georgia Statutes §§ 49-4-168.1(a)(7)**
**(any other applicable statute sections and amendments)**

254. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

255. This is a claim for treble damages and penalties under the Georgia False Claims Act, Florida Statutes §§ 49-4-168, et seq.

256. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Georgia, within the meaning of Georgia Statutes § 49-4-168.1(a)(7).

257. The State of Georgia, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

258. As a result of Defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

259. The State of Georgia is also entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim

made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count IX**

**Illinois False Claims Act**
**(740 ILCS §§ 175/3(a)(1)(A) and (a)(1)(B)**
**(any other applicable statute sections and amendments)**

260. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein. This is a claim for treble damages and penalties under the Illinois False Claims Act, 740 ILCS §§ 175/1, et seq.

261. Through the acts described above, Defendant has knowingly present or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Illinois, within the meaning of Illinois Statutes § 175/3(a)(1)(A).

262. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent invoices and billings paid or approved, within the meaning of 740 ILCS § 175/3(a)(1)(B).

263. The State of Illinois, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

264. As a result of Defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

265. The State of Illinois is also entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count X**

**Illinois False Claims Act**
**(740 ILCS § 175/3(a)(1)(G)**
**(any other applicable statute sections and amendments)**

266. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

267. This is a claim for treble damages and penalties under the Illinois False Claims Act, 740 ILCS §§ 175/1, et seq.

268. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Illinois, within the meaning of 740 ILCS § 175/3(a)(1)(G).

269. The State of Illinois, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

270. As a result of Defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

271. The State of Illinois is also entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XI**

**Indiana False Claims and Whistleblower Protection Act**
**Indiana Code §§ 5-11-5.5-2(b)(1) and (b)(2)**
**(any other applicable statute sections and amendments)**

272. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

273. This is a claim for treble damages and penalties under the Indiana False Claims and Whistle Blower Protection Act, Indiana Code §§ 5-11-5.5, et seq.

274. Through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Indiana, within the meaning of Indiana Code§ 5-11-5.5-2(b)(1).

275. Through the acts described above, Defendant have knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent invoices and billings paid or approved, within the meaning Indiana Code § 5-11-5.5-2(b)(2).

276. The State of Indiana, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

277. As a result of Defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

278. The State of Indiana is also entitled to the maximum penalty of $5,500 to $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XII**

**Indiana False Claims and Whistle Blower Protection Act**
**Indiana Code § 5-11-5.5-2(b)(6)**
**(any other applicable statute sections and amendments)**

279. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

280. This is a claim for treble damages and penalties under the Indiana False Claims and Whistle Blower Protection Act, Indiana Code §§ 5-11-5.5, et seq.

281. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Indiana, within the meaning of Indiana Code § 5-11-5.5 et seq.

282. As a result of Defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

283. The State of Indiana is also entitled to the maximum penalty of $5,500 to $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XIII**

**Indiana Medicaid False Claims and Whistle Blower Protection Act**
**Indiana Code § 5-11-5.7**
**(any other applicable statute sections and amendments)**

284. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

285. This is a claim for treble damages and penalties under the Indiana False Claims and Whistle Blower Protection Act, Indiana Code §§ 5-11-5.7, et seq.

286. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Indiana, within the meaning of Indiana Code § 5-11-5.7, et seq.

287. As a result of Defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

288. The State of Indiana is also entitled to the maximum penalty of $5,500 to $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XIV**

**Louisiana Medical Assistance Programs Integrity Law**
**Louisiana Revised Statutes §§ 46:438.3(A) and (B)**
**(any other applicable statute sections and amendments)**

289. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

290. This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law, Louisiana Revised Statute §§ 46:437.1, et seq.

291. Through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Indiana, within the meaning of Louisiana Statutes § 46:438.3(A).

292. Through the acts described above, Defendant has knowingly engaged in misrepresentations to obtain, or attempt to obtain, payment, within the meaning of Louisiana § 46:438.3(B).

293. The State of Louisiana, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

294. As a result of Defendant's acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

295. The State of Louisiana is entitled to the maximum penalty of $10,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XV**

**Michigan Medicaid False Claims Act**
**Michigan Statutes § 400.607(1)**
**(any other applicable statute sections and amendments)**

296. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act, Michigan Statues §§ 400.601, et seq.

297. Through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Michigan, within the meaning of Michigan Statutes § 400.607(1).

298. As a result of Defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

299. The State of Michigan is also entitled to the maximum penalty of $50,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

## Count XVI

### Michigan Medicaid False Claims Act
### Michigan Statues § 400.607(3)
### (any other applicable statute sections and amendments)

300. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

301. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act, Michigan Statues §§ 400.601, et seq.

302. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Indiana, within the meaning of Michigan Statutes § 400.607(3).

303. As a result of Defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

304. The State of Michigan is entitled to the maximum penalty of $50,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

## Count XVII

**Rhode Island False Claims Act**
**Rhode Island Statutes Chapter 1.1 §§ 9-1.1-3(a)(1) and (a)(2)**
**(any other applicable statute sections and amendments)**

305. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

306. This is a claim for treble damages and penalties under the Rhode Island False Claims Act, Rhode Island Statues Chapter 1.1 §§ 9-1.1-1, et seq.

307. Through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent invoices and billings to officers, employees or agents of the State of Rhode Island, within the meaning of Rhode Island Statutes Chapter 12 § 9-1.1-3(a)(1).

308. Through the acts described above, Defendant have knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent invoices and billings paid or approved, within the meaning Rhode Island Statues Chapter 12 § 9-1.1-3(a)(2).

309. The State of Rhode Island, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

310. As a result of Defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

311. The State of Rhode Island is also entitled to the maximum penalty of $10,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XVIII**

**Rhode Island False Claims Act**
**Rhode Island Statues Chapter 1.1 § 9-1.1-3(a)(7)**
**(any other applicable statute sections and amendments)**

312. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

313. This is a claim for treble damages and penalties under the Rhode False Claims Act, Rhode Island Statutes Chapter 1.1 §§ 9-1.1-1, et seq.

314. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Rhode Island, within the meaning of Rhode Island Statutes Chapter 1.1 § 9-1.1-3(a)(7).

315. As a result of Defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

316. The State of Rhode Island is also entitled to the maximum penalty of $10,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XIX**

**Tennessee Medicaid False Claims Act**
**Tennessee Statutes §§ 71-5-182(a)(1)(A) and (a)(1)(B)**
**(any other applicable statute sections and amendments)**

317. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

318. This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act, Indiana Code §§ 71-5-181, et seq.

319. Through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Tennessee within the meaning of Tennessee § 71-5-182(a)(1)(A).

320. Through the acts described above, Defendant have knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent invoices and billings paid or approved, within the meaning Tennessee § 71-5-182(a)(1)(B).

321. The State of Tennessee, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

322. As a result of Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

323. The State of Tennessee is also entitled to the maximum penalty of $25,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XX**

**Tennessee Medicaid False Claims Act**
**Tennessee Statutes § 71-5-182(a)(1)(D)**
**(any other applicable statute sections and amendments)**

324. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

325. This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act, Tennessee Statues §§ 71-5-181, et seq.

326. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Tennessee, within the meaning of Tennessee Statutes § 71-5-182(a)(1)(D).

327. As a result of Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

328. The State of Tennessee is also entitled to the maximum penalty of $25,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim

made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

**Count XXI**

**Washington Medicaid Fraud False Claims Act**
**Washington Statutes RCW 74.09 §§ 202(1)(a) and (1)(b)**
**(any other applicable statute sections and amendments)**

329. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

330. This is a claim for treble damages and penalties under the Washington Medicaid Fraud False Claims Act, Washington Statutes RCW 74.09 §§ 101, et seq.

331. Through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the State of Washington, within the meaning of Washington Statutes RCW 74.09 § 202(1)(a).

332. Through the acts described above, Defendant have knowingly made, used, or caused to be made or used, false or fraudulent records and statements to get false and fraudulent invoices and billings paid or approved, within the meaning Washington Statutes RCW 74.09 § 202(1)(b).

333. The State of Washington, unaware of the falsity of the records, statements and invoices and billings made or caused to be made by Defendant, paid and continues to pay invoices and billings that would not be paid but for Defendant's unlawful conduct.

334. As a result of Defendant's acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

335. The State of Washington is entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

## Count XXII

**Washington Medicaid Fraud False Claims Act**
**Washington Statutes RCW 74.09 § 202(1)(g)**
**(any other applicable statute sections and amendments)**

336. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

337. This is a claim for treble damages and penalties under the Washington Medicaid Fraud False Claims Act, Washington Statutes RCW 74.09 §§ 101, et seq.

338. Through the acts described above, Defendant has knowingly made, used, or caused to be made or used, false records or statements and concealed, avoided, or decreased an obligation to pay or transmit money or property to the State of Washington, within the meaning of Washington Statutes RCW 74.09 § 202(1)(g).

339. As a result of Defendant's acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

340. The State of Washington is also entitled to the maximum penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

341. Any other jurisdiction to which the Defendant's misconduct has extended where state FCAs exist. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

342. As a result of Defendant's acts, any other jurisdiction to which the Defendant's misconduct has extended where state FCAs exist has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

343. Any other jurisdiction to which the Defendant's misconduct has extended is also entitled to the maximum penalty allowable under applicable state FCAs, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

344. Other applicable whistleblower program provisions of the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, and the Tax Relief and Health Care Act and any other applicable statute sections and amendments.

345. Relator repeats and realleges each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

346. As a result of Defendant's acts, the United States Government has been damaged, and continues to be damaged, in a substantial amount to be determined by the government, including, but not limited to at trial.

347. The United States Government is also entitled to the maximum penalty allowable under applicable whistleblower program provisions of the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, and the Tax Relief and Health Care Act, as amended by the Civil Penalties Inflation Act, for each and every false and fraudulent claim made and caused to be made by Defendant, arising from their unlawful conduct as described herein.

## VI. PRAYER

WHEREFORE, Relator prays for judgment and relief against the Defendant as follows:

1. That Defendant cease and desist from violating the FCA (31 U.S.C. §§ 3729 et seq), the state FCAs, under similar provisions of the state FCAs previously referenced herein, and other applicable provisions of the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Foreign Corrupt Practices Act, and the Tax Relief and Health Care Act;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the States have sustained because of Defendant's actions, plus a civil penalty of $11,000, as amended by the Civil Penalties Inflation Act, for each violation of 31 U.S.C. §§ 3729, plus civil penalties of the maximum amounts allowable by statutes for each state, and applicable whistleblower program as previously referenced herein;

3. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §§ 3730(d), similar provisions of the state FCAs, under similar provisions of the state FCAs

previously referenced herein, and other applicable provisions of the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, and the Tax Relief and Health Care Act;

4. That Relator be awarded all costs of this action, including attorney's fees, costs and expenses; and

5. That Relator recovers such other and further relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: 4/19/2021

By: Keith A. Mosley II

Keith Mosley II, Esq.
GA Bar No. 203514
2161 Peachtree Rd Suite 403
Atlanta, Ga 30309
Tel: (404) 725-6181