**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.* | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 1:21-cv-00688-RLY-MJD |
| DELOITTE, *et al.*, | ) |
| | ) **UNDER SEAL** |
| Defendants. | ) |
| COMMONWEALTH OF KENTUCKY, TOWN OF BAY HARBOR ISLANDS, | ) |
| Interested Parties. | ) |
| LUCRETIA BRINSON, | ) |
| Relator. | ) |

## RELATOR'S REPLY TO ENTRY DENYING MOTION TO REOPEN

Relator in response to the Court's recent order denying the Rule 60(b)(1) motion for relief from the final judgment in the above-mentioned case, respectfully request that the Court reconsider its decision based on the following points:

As for Rule 60(a), the Relator humbly submits that there are numerous clerical mistakes or errors in orders, or other parts of the court record reflected in the Docket Reports for Case #00688 and #00986 judgments that have been built upon throughout the case resulting in prejudice to the Relator (and other Plaintiffs) and continue to be reflected, as of the timely filing of this reply. The Relator humbly submits reconsideration of the following:

(1) Local Rule 5-2(b) Documents Exempt from Electronic Filing was applicable as evidenced by written rules, court website postings for HSDs with green coversheet, confirmed orally and executed multiple times by physical actions by the manager within the clerk of the court. However, if the judge in this case argues that Local Rule 5-2 (a) Electronic filing of documents is required pursuant to Fed. R. Civ. P. 5(d)(3)(A) or 5-2(d), the clerk of the court orally and by physical actions made an error multiple times. Additional consideration had also been posed including the "sudden" and "surprising" departure of this highly tenured professional, likely vested with pension benefits, who orally, confidently and gratuitously, espoused that she would be personally responsible for handling court submissions, initial and subsequent, for this HSD case, to at least two separate individuals, the Relator and the Relator's attorney on multiple occasions. She also stated that we should ask for her specifically by name, "Ruth". She returned calls and left voice messages confirming her successful docketing and case management for several months throughout the pretrial proceedings. A reasonable person would believe that this was the appropriate, approved process based on the credibility of the manager of the clerk of the court.

(2) Local Rule 42-1 – Motions to Consolidate was recommended by U.S. Attorney Fisher to correct a mistake made by the clerk of the court. During this time, the clerk of the court had not granted the Relator or the Relator's attorney access to the court filings. While "surprising", it was considered reasonable given the manager of the clerk of the court's role in personally handling this HSD case while under seal. As previously described in the motion to reopen, this mistake resulted in several new motions to address this mistake from multiple parties, including Motions to Appear on behalf of attorneys that had already appeared in the original case.

Section 3730(b)(2) of the False Claims Act states that the qui tam whistleblower must provide the government with a “written disclosure of substantially all material evidence and information” possessed. The Relator also has a property interest and accountability to continue active participation the identification of new evidence and continued disclosure of "all material evidence and information" during the investigation. The False Claims Act provides that the court may limit the qui tam whistleblower’s participation in the suit if it determines “that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government’s prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment . . . .” If the qui tam whistleblower does not assist the Government after filing the

complaint, hinders development of the case, or unreasonably opposes the Government, his share of the recovery could be reduced. The Relator's share of the recovery has been described as akin to a lawyer's "contingency fees". (See U.S., ex rel. Polansky v. Executive Health Resources and https://www.whistleblowerllc.com/relators-role-in-false-claims-act-investigations-towards-a-new-paradigm/ (Describing the role of the Relator and property interest).

There is no motion reflected in the docket or court order limiting the "qui tam whistleblower's participation in the suit....". However, the Relator and Relator's attorney have been "limited", "hindered", and required to partake in "repetitious" actions as a result of mistakes made by the clerk of the court and subsequent court orders by the judge based on the docket.

(3) Mistake (2) also highlights another mistake that impacts the investigation and Rule 9b. The clerk of the court docketed #0068 reflecting a defendant, the United State Health and Human Services, that was not specifically named as a defendant in the complaint or supporting filing documents. Since there was no official motion or consultation among the parties about adding this defendant at that time, while the investigation and the continued disclosure of material evidence and information may have yielded that result over time, this stands as a mistake that has not been remedied. The Relator respectfully submits, that this mistake may have materially impacted the investigatory actions and intervention decision of the United States. In Bodem v. Bancroft, an injured plaintiff sought consolidation of two actions she had filed against two separate defendants, relating to two separate rear-end collisions. The plaintiff sought consolidation of the two actions, arguing that if the two trials proceeded separately she would not “get a fair determination of what her damages are, and who in fact caused them” because each defendant could point the finger at the non-party. The trial court granted consolidation and one of the defendants appealed. (See Bodem v. Bancroft, 825 N.E.2d 380 (Ind. Ct. App. 2005) and https://mckinneylaw.iu.edu/ilr/pdf/vol39p817.pdf)

While Boden was concerned about each defendant pointing the finger at the non-party, the Relator, in this case, purports that the more relevant concern is the pointing of fingers between the governmental agencies, state and federal, rather than the contractor.

This sensitivity is particularly poignant from the Relator's perspective. In State of Indiana v IBM, prior to prevailing and securing a court award of

$128 million in damages for IBM's breach of contract, Marion County Judge David Dreyer, issued a court opinion, resulting in a motion for recusal by the State of Indiana, writing, "Overall, both parties are to blame...“misguided government policy and overzealous corporate ambition."(See “Nobody Wins in Indiana vs. IBM Lawsuit, Judge Says.” GovTech, 19 July 2012, www.govtech.com/health/nobody-wins-in-indiana-vs-ibm-lawsuit-judge-says.html. and State v. Int'l Bus. Machs. Corp. 160 N.E.3d 1127 (Ind. App. 2020)).

The Indianapolis Star reported statements by John Maley and Peter Rusthoven of Barnes & Thornburg, including: "We are very pleased the court awarded $128 million in damages for IBM’s failure to keep the important promises it made to the State of Indiana...."This has been a long, tough battle with a big corporation that refused all along to take responsibility for its poor performance....IBM must be held responsible for not doing what it promised." (See Hussein, T. E. and F. (n.d.). Court: IBM owes $128M in welfare privatization dispute. The Indianapolis Star. https://www.indystar.com/story/news/2017/08/07/court-ibm-owes-state-128-m-welfare-privatization-dispute/544789001/). IBM didn't act alone in its defense against multiple lawsuits. In Bowman ex rel. J.B v. Int'l Bus. Machines Corp., 1:11-cv-0593 RLY-TAB (S.D. Ind. Oct. 23, 2012), IBM secured James Perez, Program Manager, Deloitte Consulting, LLP, who has worked with ICES [decommissioned for IEDSS] and ISETS [to be decommissioned for InVest] since 1997, to serve as an expert witness in a class action lawsuit to discredit and disqualify the expert witness, Dr. Richard Goldstein, for a class of Medicaid recipients whose benefits were terminated without a fair appeal hearing. Based on the information presented by IBM and Deloitte Consulting, LLP, the motion was granted by Chief Judge Richard L. Young. (See “BearingPoint to Deloitte “Seamless” Transition - ExecutiveBiz.” www.Executivebiz.com, 6 July 2009, www.executivebiz.com/2009/07/robin-lineberger-bearingpoint-to-deloitte-seamless-transition/. ("the seamless integration of our business. The next is to maintain relevance by driving incremental products and services to their respective channels: Deloitte's legacy services to Bearing Point clients and, correspondingly, BearingPoint services to Deloitte clients. Thirdly, we plan to develop and extend our people's capabilities through goal setting, individualized career plans, etc.)(See In re BearingPoint, Inc., 453 B.R. 486 “....“With the benefit of hindsight, and new considerations coming to my attention,” “It's well established in this Circuit, if not also elsewhere, that a judge's mistake of fact can support an award of 60(b) relief.” “We believe that the plain language of Rule 60...and this Court's action in Cappillino [ v. Hyde Park Central School

District, 135 F.3d 264 (2d Cir.1998) ] all demonstrate that a bankruptcy court has the authority to reopen a judgment based on its own mistake of fact." Also see Matrix Capital Management Fund v. BearingPoint 576 F.3d 172 (4th Cir. 2009 pg 23 - 24 (Holding that the district court abused its discretion in denying the plaintiffs' Rule 59(e) motion seeking to alter the judgment of dismissal with prejudice and allow an amended complaint.))

The Relator humbly asserts that many of these considerations could meet the standard for 60(b)(1) - (6), including supplemental information below.

As a result of the IBM lawsuits, the State of Indiana retained IBM's electronic document technology and its fraud prevention measures (FADS). State of Indiana Governor Daniels declared, "The fraud which was rampant in the Indiana welfare system has apparently stopped," "There hasn't been a single allegation — let alone conviction — whereas there were dozens before. And official reports say more than $100 million was stolen in the last year before we began to try to make this change."

The fraud prevention measures (FADS) has also been characterized as a "best practice" by the U.S. Health and Human Services OIG responsible for oversight of the 50 State's Medicaid Fraud Control Units. The replacement of FADS during the protected activity period, and more specifically during the investigation, ending an interesting 92 days, versus the statute mandated 60 day, extension to the seal period one day before the Defendant is (has been) awarded contract(s) that directly involve allegations in the complaint. (See "Medicaid Fraud Control Units (MFCUs) | Medicaid Fraud | Office of Inspector General | U.S. Department of Health and Human Services." Oig.hhs.gov, oig.hhs.gov/fraud/medicaid-fraud-control-units-mfcu/. "As part of its comprehensive review process, the CMS review team in the final 2015 report, identified one practice that merits consideration as a noteworthy or "best" practice. The state utilizes an innovative risk assessment tool entitled "Credible Allegation of Fraud Tool", or CAF tool to identify and evaluate fraud. The Indiana State Medicaid agency in collaboration with its Fraud and Abuse Detections System contractor has developed a comprehensive set of tools to evaluate provider allegations including fraud. According to the state, the CAF tool includes three components: a preliminary investigation assessment, risk assessment, and credible allegation of fraud assessment. The tools help to increase the state's efficiency and consistency in reviewing provider integrity allegations by utilizing an objective systematic approach to determine the most appropriate course of action that does not inappropriately

single out providers. The CAF tool utilizes 29 criteria for determining whether a provider's past and present billing activity rises to the level of a credible allegation of fraud. It further takes into consideration a variety of background checks and risk factors. Each criterion is given a weighted score to arrive at a composite assessment score. Some categories are considered high risk and some categories require a mandatory score. Based on the overall score or the score of a high risk category, a recommended approach of action is determined. When an allegation against a provider is received, the state evaluates and determines if it rises to the level of fraud. If provider fraud is not initially believed to be associated with the allegation, the preliminary investigation assessment tool is used. This may result in no action against the provider, or it may lead to a full risk assessment with or without pre pay review. The state processes more serious allegations through the risk assessment tool. This again could result in no action or lead to a pre-pay review, an audit (self, desk or field), or a MFCU referral. All proposed audits are first vetted through the MFCU. If the original allegation suggests fraud, or if the preliminary investigation or risk assessment tools indicate possible fraud, the state will make use of the CAF portion of the tool. Program integrity staff indicated that they use the CAF portion of the tool on 95 percent of provider allegations. Typically, preliminary investigations of fraud or abuse complaints determine if there is sufficient basis to warrant a full investigation. Full investigations are conducted when preliminary investigations provide reason to believe fraud or abuse has occurred. They are resolved through a referral to the MFCU or administrative or legal disposition. In Indiana, the standardized CAF tool is used to conduct all investigations from intake to final disposition; therefore, the state does not make a distinction between preliminary and full investigations. Notwithstanding the usefulness of a standardized set of tools using multi-factored analysis in evaluating Medicaid fraud and abuse cases, the team found compliance issues with the actions taken by the state in cases involving CAFs. These issues are discussed in Risk Area 3. Risk Area 3 details risks that were identified in the state's procedures to suspend payments in cases involving a credible allegation of fraud.

Medicaid Fraud Control Units (MFCUs) investigate and prosecute Medicaid provider fraud as well as abuse or neglect of residents in health care facilities and board and care facilities and of Medicaid beneficiaries in noninstitutional or other settings. MFCUs operate in each of the 50 States, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands. MFCUs, usually a part of the State Attorney General's office, employ teams of investigators, attorneys, and auditors; are constituted as single, identifiable

entities; and must be separate and distinct from the State Medicaid agency. OIG, in exercising oversight for the MFCUs, annually recertifies each MFCU, assesses each MFCU's performance and compliance with Federal requirements, and administers a Federal grant award to fund a portion of each MFCU's operational costs. (See “Certification Letters | MFCU | Office of Inspector General | U.S. Department of Health and Human Services.” Oig.hhs.gov, oig.hhs.gov/fraud/medicaid-fraud-control-units-mfcu/certification.asp. "OIG has Federal grant oversight for the MFCUs that operate in each of the 50 States, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, including the responsibility to certify, and annually recertify, each of them. States and territories are required to maintain a MFCU or receive a waiver from the Centers for Medicare & Medicaid Services." The annual certification letters posted included only North Dakota Certification Letter (2019), Puerto Rico Certification Letter (2018), and the U.S. Virgin Islands Certification Letter (2018).

Not only does the Relator suggest that the newly awarded contract to the Defendant for FADS present a direct conflict of interest for the MFCU. (See United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.782 F.3d 260 (6th Cir. 2015 (In this case, Deloitte is supporting the AdvanceMed (multi-state ZPIC) and the alleged fraudster). The Defendant has an inverse relationship in the recoupment of fraudulent sanctions. Relator alleges that this could directly support the US OIG's findings that recoveries are reduced to a "negotiated" or "settled" rate of 20%, thereby relinquishing 80%. (See https://oig.hhs.gov/oei/reports/oei-03-13-00630.pdf)

Relator understands that the court has discretion in ruling on Rule 60(b)(1) motions, but she respectfully request that the Court reevaluate the merits of my motion in light of the points raised above. Relator firmly believes that the interests of justice and fairness would be best served by granting relief in this case.

Relator also request an automatic extension of time.

Relator kindly request that the Court reconsider the previous decision and provide a revised order addressing the issues raised in Relator’s motion.

Dated: June _12_, 2023

Respectfully submitted,

s/ Keith Mosley II, Esq.

Keith Mosley II, Esq.
2161 Peachtree Rd #403
Atlanta, Ga 30309
Keith.mosley@mosley-law.com
Phone: 404.725.6181

## CERTIFICATE OF SERVICE

I hereby certify that on the __12__ day of June 2023, a copy of the foregoing was served upon Counsel by means of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

s/ Keith Mosley II, Esq.

Keith Mosley II, Esq.
2161 Peachtree Rd #403
Atlanta, Ga 30309
Keith.mosley@mosley-law.com
Phone: 404.725.6181